# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NELSON OCASIO, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 17-cv-755 |
| MAYOR MICHAEL CIACH, COUNCIL | : | |
| PRESIDENT CHRISTINE PETERSON, | : | |
| and THE BOROUGH OF UPLAND, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

**Joyner, J.**                                                **January 9, 2019**

Before the Court are Defendants' Motion for Summary Judgment (Doc. No. 21) and Plaintiff's Response thereto (Doc. No. 22). For the reasons set forth below, we deny in part and grant in part Defendants' Motion.

This case arises from Plaintiff Nelson Ocasio's termination as Police Chief of Upland Borough, Pennsylvania. At the heart of Plaintiff's Complaint is his allegation that the process by which his public employment was terminated deprived him of procedural due process under the Fourteenth Amendment. Plaintiff alleges that Defendants Ciach and Peterson, motivated by retaliatory and racial animus, engineered Plaintiff's termination while maintaining the appearance of providing him notice and requisite <u>Loudermill</u> hearings, thereby depriving Plaintiff of pre-deprivation meaningful process.

1

This Motion is fully briefed and ripe for the Court's adjudication. The Court has considered the parties' submissions and decides this matter without oral argument. Fed. R. Civ. P. 78; Loc. R. Civ. P. 7.1(f).

I.  **FACTUAL BACKGROUND**

On January 2, 2013, Plaintiff Ocasio was appointed Chief of Police for the Borough of Upland, Pennsylvania. (Compl. ¶10, Doc. No. 1).[1] On February 23, 2016, Plaintiff alleges he was notified by Defendant Ciach and Defendant Peterson together that he was terminated from his position as Police Chief. Id. at ¶19.

At the time Plaintiff was terminated, Defendant Ciach was Mayor of the Borough of Upland, a position he held from 2005 through 2017. (Def. Ex. 1 ¶1, Doc. No. 21-1). As Mayor, Mr. Ciach did not have authority to hire or fire police officers (including police chiefs); that authority rested with the borough council. Id. at ¶¶4-5. He did have authority to temporarily suspend a police chief pending approval by the council. Id. at ¶7. As Mayor, Defendant Ciach did not have a vote on the borough council unless there was a tie. Id. at ¶4. During the time surrounding Plaintiff's termination, Defendant

---

[1] Unless otherwise noted, the facts are taken from Plaintiff's Complaint. ("Compl.," Doc. No. 1). In line with the standards governing Fed. R. Civ. P. 12(b)(6), all factual allegations in the Complaint are generally accepted as true. See Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

Peterson served in two roles, both as councilperson and as Police Department Assistant. Id. at ¶18.

*A. Allegations of Racial Animosity*

Beginning in 2015 and continuing through the present, Defendant Peterson used racist terms to refer to Plaintiff Ocasio, allegedly calling Plaintiff "a spic," "wetback," and "illegal Mexican." Id. at ¶19. "Specifically, statements were made by [D]efendant Peterson to Upland Councilman Harold Peden, Councilman Edward Mitchell and Chester Police Chief Joseph Bail that when Plaintiff, then deputy Chief, would succeed then-Upland Borough Chief John Easton, the borough's first African-American police chief, [D]efendant Peterson said, '[f]irst a nigger and now a spic?'" Id. at ¶20. Councilman Mitchell testified that he heard Defendant Ciach make racially disparaging remarks related to Police Chief Easton, Plaintiff Ocasio's predecessor, namely that "John Easton was just a fucking nigger." (Pl. Opp., Ex. 12, Doc. No. 22-1 at 71). Councilmember Mitchell further testified that when he spoke with Defendant Ciach before Plaintiff Ocasio was promoted to Police Chief in 2013, Defendant Ciach said, "Ed, if you hire, you know, a fucking spic, you can't have it. People down in the graveyard be flipping." Id.

*B. Allegations of Retaliatory Motive for Plaintiff's Termination*

In July of 2015, following prior Borough Commission Reports noting concern that Defendant Peterson's dual positions as Administrative Assistant and Vice-President of the Borough Council posed a conflict of interest, (Pl. Ex. 3, Ex. 4, Ex. 5), Plaintiff commissioned another report that "again identified 'the conflict of interest' both administratively and operationally that Peterson presented as both a councilperson and police secretary." (Pl. Opp. at 9). Notwithstanding these reports, Defendant Peterson maintained her dual roles.

*C. Events Surrounding Plaintiff's Termination as Police Chief*

On February 8, 2016, Plaintiff Ocasio became aware of a timecard forgery involving Upland Officer Michael Irey and Defendant Peterson, who was then Upland Police Administrative Assistant. (Compl. ¶11).

On February 18, 2016, Defendant Ciach met with Plaintiff Ocasio to raise concerns he had with Mr. Ocasio's performance as Chief during the previous year. (Def. Ex. 1. ¶8, Doc. No. 21-1). Defendant Ciach testified that he "had concluded that [Plaintiff's] performance as chief in 2015 had been inadequate and counterproductive to the best interests of Upland Borough," (Def. Ex. 1 at ¶10), based on the "alleged forced resignation of Dan Smith and the lack of investigation of our missing cameras which I felt were potentially criminal in nature." Id. at ¶8. During their February 18th meeting, Defendant Ciach "told Chief

4

Ocasio that [he] would be recommending [he] be reduced in rank to deputy chief," and "suggested a date and time a Loudermill meeting could be held so that [Mr. Ciach] could present [his] concerns about [Plaintiff's] performance to the public safety committee prior to making any official recommendation that [Plaintiff] be reduced in rank, and so Chief Ocasio could address the committee himself." Id. at ¶¶13-14. Defendant Ciach offered Plaintiff "24 hours to decide whether he would agree to a voluntary reduction in rank from chief to deputy chief," with no reduction in salary. Id. at ¶15. That same day, Defendant Peterson told Mr. Ciach, "good luck with [Plaintiff's] demotion." Id. at ¶15.

The next day, February 19, 2016, Defendant Ciach had a copy of his February 17, 2016 performance review letter delivered to Plaintiff's home. Id. at ¶16.

Defendant Ciach's letter dated February 17, 2016 does not mention a Loudermill hearing. The letter informs Plaintiff that Defendant Ciach "will be recommending [Plaintiff's] immediate reassignment of duties back to the position of Deputy Chief." (Def. Ex. 2 at ¶13). Defendant Ciach also testified that he typed this letter, summarizing his concerns with Plaintiff Ocasio's 2015 performance, on February 9, 2016 (the date located on the second page of the letter) then updated the letter on

February 17th.  (Def. Ex. 1 at ¶12).  Plaintiff did not respond to this letter.

On February 22, 2016, Plaintiff filed criminal charges against Defendant Peterson for forgery, theft by unlawful taking, and tampering with government records, in connection with the timecard forgery he became aware of earlier that month.  (Compl. ¶12, ¶17).

The same day, February 22nd, after learning that Plaintiff Ocasio "had ordered all borough officials, including [himself], locked out of police headquarters," Defendant Ciach, trying to communicate with him to "ask what was going on" was told by Plaintiff, "Mike, you have 5 seconds to get away from me." (Def. Ex. 1 at ¶21).  Defendant Ciach "immediately verbally suspended Chief Ocasio for insubordination."  Id.  Defendant Ciach then issued Plaintiff Ocasio a letter, dated February 22, 2016, informing him that he was suspended as Police Chief "as a direct result of you [sic] willful disrespect and disobedience of a direct request and order to answer questions regarding your authority to order our vendor . . . to lockout Members of Council, Detective Irey and myself from the police department, and your threatening response to the same."  (Def. Ex. 4 at 17). Defendant Ciach also asked the Delaware County D.A.'s Office to investigate Plaintiff's arrest of Defendant Peterson.  (Def. Ex. 1 at ¶23).

Plaintiff alleges that on February 22, 2016, the day he arrested Defendant Peterson in connection with the alleged timecard forgery, he was informed by both Defendant Ciach and Peterson that he was suspended without pay. (Compl. ¶26).

On February 23, 2016, Defendant Ciach wrote and had delivered to Plaintiff's home another letter (Def. Ex. 5 at 19), summarizing the performance concerns he had stated in his February 17th letter and February 18th in-person meeting. The February 23, 2016 letter informed Plaintiff Ocasio that a Loudermill hearing would be "held on that day at 4:30 p.m." Id.

A Loudermill hearing took place on February 23, 2016. Chief Ocasio did not attend, but Fraternal Order of Police ("F.O.P.") attorney, Skip Miller, did attend on Plaintiff's behalf. (Def. Ex. 1 at ¶27). Plaintiff testified that Mr. Miller told him he did not have to attend the hearing since at that time Plaintiff was suspended. Id. at ¶28; (Def. Ex. 6 at 137). The first Loudermill hearing resulted in Plaintiff Ocasio's suspension "as chief with intent to terminate his employment. . .pending the outcome of an independent investigation of events." (Def. Mot. Ex. 1 at ¶29).

A six-month investigation into Plaintiff Ocasio's performance as police chief during 2015 and the incidents surrounding his suspension and termination in February, 2016, was conducted by an employment law firm and headed by Joe Hackett. (Def. Mot.

7

Ex. 1 at ¶30). Defendant Ciach referred to the investigation as "independent." Plaintiff, on the other hand, disputes its independence. He testified, "[t]hat's not an independent evaluator when you have one of your guys getting someone in that you need to get a job done," referring to Defendant Ciach's friendship with Mr. Hackett. (Def. Ex. 6 at 23).

On November 16, 2016, following the investigation, Plaintiff was informed by letter that before taking any final action regarding his employment, the Borough Public Safety Committee would conduct a second <u>Loudermill</u> hearing for him on November 2, 2016, and would use the investigation's recommendations as the basis for their final disciplinary decision. (Def. Ex. 8). Additionally, Plaintiff was notified that the council would vote whether to terminate his employment at its November 16, 2016 meeting. Plaintiff did not appear at the November 2nd <u>Loudermill</u> hearing, nor at the November 16th council vote. (Def. Ex. 1 at ¶¶30-31).

On November 16, 2016, the council voted to terminate Plaintiff's employment. Defendant Peterson abstained from the vote. <u>Id.</u> at ¶32.

## II. LEGAL STANDARD

Summary judgment is only proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits. . .show that there is no genuine

8

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505 (1986) (citing Fed. R. Civ. P. 56(c)). We must view any inferences drawn from the underlying facts "in the light most favorable to the party opposing [summary judgment]." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 82 S. Ct. 993 (1962)).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will defeat a motion for summary judgment. Id. at 248. If the moving party fulfills its burden to identify "specific portions of the record that establish the absence of a genuine issue of material fact. . ., the burden shifts to the nonmoving party to . . . 'come forward with "specific facts showing that there is a genuine issue for trial."'" Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015) (quoting Matsushita Elec. Indus. Co., 475 U.S. at 587(quoting Fed. R. Civ. P. 56(e))). The claimed dispute should "be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-289, 88 S. Ct. 1575 (1968). It is not the judge's function at this stage to "weigh the evidence and determine the truth of the matter." Santini, 795

F.3d at 416. "In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252.

**III. DISCUSSION**

*A. Plaintiff's Pre-Deprivation Procedural Due Process Claim Under 42 U.S.C. §1983*

Defendants argue that plaintiff cannot establish a violation of due process because he was given notice and an opportunity to be heard. To succeed on a deprivation of property-based procedural due process claim, the plaintiff must show that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2005) (quoting Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Cleveland

Bd. of Educ. v. Loudermill, 470 U.S. 532, 547 105 S. Ct. 1487 (1985). "In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." Id. However, "when access to procedure is absolutely blocked or there is evidence that the procedures are a sham, the plaintiff need not pursue them to state a due process claim." Id. at 118.

Defendants cite Alvin v. Suzuki, which is in line with similar cases that found no due process violation - even when plaintiffs alleged their pre-termination hearings were biased - because plaintiffs failed to take advantage of their opportunity to be heard. See Alvin, 227 F.3d at 119 ("like the plaintiff in McDaniels, Alvin has not used all the processes available, and he cannot convert his difficulties with quickly triggering the informal process into a contention that the entire process, which he has not yet used, is biased."). See McDaniels v. Flick, 59 F.3d 446, 459 (3d Cir. 1995) (internal citations omitted) (noting that the presence of bias during a pre-termination hearing might be mitigated by an impartial post-

11

deprivation hearing and that "[a]lthough due process requires an impartial decisionmaker before final deprivation of a property interest, it is not clear that strict impartiality is required at each stage of the process."). See Dykes v. Southeastern Pennsylvania Transportation Authority, 68 F.3d 1564 (3d Cir. 1995) (finding failure to state a claim for due process violation where plaintiff failed to request arbitration that was available to him, even when the "plaintiff alleged that the defendants acted in concert to deprive him both of a meaningful hearing and of arbitration" because the arbitration process had safeguards to protect against a diminishment of process that the alleged bias might result in.").

Here, Plaintiff argues that the process he was afforded was biased because Defendant Ciach used his "fraudulent" performance reviews "to influence other council members to vote for plaintiff's termination as Police Chief." (Pl. Opp. at 10). Yet case law shows that where a plaintiff fails to take advantage of the hearings he was provided, his pre-deprivation due process claim will not survive summary judgment on the bare allegation that bias infected one stage of his hearings. However, although Plaintiff Ocasio did not attend any of the pre-deprivation Loudermill hearings, our analysis does not end there. We must also assess the content of the notice provided

to Plaintiff in order to determine whether his opportunity to be heard was "meaningful" under Loudermill.

"[F]ailure to describe the nature of evidence supporting termination violates due process." Jennings-Fowler v. City of Scranton, 680 F. App'x 112 (3d Cir. 2017). In Jennings-Fowler, the Third Circuit found insufficient process and reversed the District Court's grant of summary judgment on plaintiff's due process claim based on the defendants' "failure to describe the nature of evidence supporting [plaintiff's] termination" beyond "boilerplate" language accusing plaintiff of "'[t]heft, willful destruction, willful defacement or willful misuse of City Property[,]' and '[i]ntentionally falsifying or altering any City record or report[,]'" coupled with "defendants' explicit lie" that no video or photographic evidence existed to support the charges against plaintiff when such evidence did exist. 680 F. App'x at 116.

In Fraternal Order of Police Lodge No. 5 v. Tucker, 868 F.2d 74, 80 (3d Cir. 1989) the Third Circuit interpreted Loudermill as standing for the proposition that "a *sina qua non* of a meaningful hearing is a sufficient explanation of the employer's evidence to permit a meaningful response." The crux of Tucker's finding that plaintiff employees had been deprived meaningful due process was that in the absence of any specifics "about the drug use allegations being investigated or the

13

evidence regarding this drug use allegation," "even assuming [plaintiffs and their attorneys] were afforded the opportunity to tell plaintiffs' side of the story, [plaintiffs] had no opportunity to explain or rebut the evidence giving rise to the 'reasonable suspicion' of on-duty drug use." 868 F.2d at 80. See also Yelland v. Abington Heights Sch. Dist., No. 3:16-2080, 2018 U.S. Dist. LEXIS 110272, at *21 (M.D. Pa. July 2, 2018) ("[A] plaintiff must be informed of the specific evidence that existed to support each of the charges and must be given a sufficient explanation of the evidence against him/her regarding each of the charges. Charges that do not contain the requisite description and that simply use boilerplate language are not sufficient. Further, 'it is sufficient that the charges that were the main focus of the termination hearing failed to provide an explanation of the evidence against [plaintiff],' for the district court to deny summary judgment on plaintiff's pretermination due process claim." (citations omitted)).

Notedly, here, as in Yelland, "notice in the plaintiff's case [is] especially important since 'there is nothing in the record indicating a prior history of negative evaluations or incidents involving the plaintiff.'" Id. at *24. Plaintiff Ocasio maintains that "up until the alleged February 17, 2016, Ciach performance report. . . plaintiff never received a

performance review by defendant Ciach let alone a negative one." (Pl. Opp. at 10).

Here, although the letters notifying Plaintiff that Defendant Ciach would be recommending to the council that he be terminated as Police Chief explained in detail the evidence against plaintiff, Plaintiff argues that "there was no basis for [Mr. Ciach's] claims in his performance evaluation and that the content of the notice was "fraudulent" and mere pre-text for Defendants Ciach's and Peterson's retaliatory and discriminatory motives to terminate him. Essentially, Plaintiff disputes the "validity of the accusations made in [Defendant Ciach's] reports." Id. Plaintiff argues that "there was no basis for [Mr. Ciach's] claims in his performance evaluation of plaintiff that Ocasio was 'Over Budget with Payroll' and had 'Unexplainable Administrative Pay.' . . .Ciach admitted that the 2015 Department Evaluation Report which he claimed was wrongfully authorized by plaintiff . . . was a total untruth." Id.

We find that the content of the notice plaintiff received before his pre-termination Loudermill hearings took place – its veracity and its specificity – is material to whether Mr. Ocasio was provided sufficient due process. Therefore, where that material fact is genuinely disputed, summary judgment is inappropriate. "The factfinder will determine whether the

15

plaintiff was afforded all of the due process rights to which he was entitled by Loudermill before he was suspended without pay. As such, the jury must determine if the defendants deprived the plaintiff of a legitimate property interest without due process in violation of the 14th Amendment." Yelland, 2018 U.S. Dist. LEXIS 110272, at *22-25.

*B. Plaintiff's Claim that Defendants Conspired to Deprive Him of Procedural Due Process*

We find that Defendants are not entitled to summary judgment on Plaintiff's claim in Count IV that they conspired to have Plaintiff terminated from his employment as Police Chief. To allege conspiracy under §1983, a plaintiff must show "(1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." Cash v. Wetzel, 8 F. Supp. 3d 644, 661 (E.D. Pa. 2014). To establish the conspiracy existed, a plaintiff must show "a combination of two or more persons to do a criminal act, or to do a lawful act by unlawful means or for an unlawful purpose." Panayotides v. Rabenold, 35 F. Supp. 2d 411 (E.D. Pa. 1999), aff'd, 210 F. 3d 358 (3rd Cir. 2000) (quoting Hammond v. Creative Financial Planning, 800 F. Supp. 1244, 1248 (E.D. Pa. 1992)).

"It is not enough that the end result of the parties' independent conduct caused plaintiff harm or even that the

16

alleged perpetrators of the harm acted in conscious parallelism. To state a claim for conspiracy under § 1983, plaintiff must claim that, 'the private actor . . . wrongfully influenced the state [actor's] decision . . . *through a conspiracy*, or else the plaintiff must seek his remedy in a state tort claim, not a federal § 1983 suit.'" Spencer v. Steinman, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997)(quoting Davis v. Union National Bank, 46 F.3d 24, 26 (7th Cir. 1994)).

At summary judgment, we find there is a genuine dispute whether Defendants Ciach and Peterson agreed to bring about the termination of Plaintiff Ocasio from his employment as Police Chief out of racial animus against Plaintiff, and in retaliation for Mr. Ocasio's arrest of Peterson, and out of his continued opposition to the conflict of interest posed by Peterson's dual roles as Administrative Assistant of the Police Department and Vice President of the Borough Council. Therefore, Defendants' motion for summary judgment on Count IV of Plaintiff's complaint is denied.

*C. Qualified Immunity*

Defendants argue they are entitled to qualified immunity because there is "no evidence Mr. Ciach violated any 'clearly established' constitutional rights in connection with [Plaintiff's] rights to procedural due process that a reasonable person would be aware of, and [no evidence] that [Defendant]

17

Peterson had any role whatsoever in the process that resulted in Ocasio's suspension and ultimate termination [because he abstained from the council vote to terminate.]" (Def. Br. at 8, Doc. No. 21-2).

To determine whether Defendants are entitled to qualified immunity, we must first evaluate whether they "violated a constitutional right." Yelland, 2018 U.S. Dist. LEXIS 110272, at *26 (citing Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151 (2001)). If we find Defendants "actually commit[ted] a constitutional violation" we must move to the second evaluation of whether "the right in question was 'clearly established' at the time the defendant acted." Id. citing Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009). "The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right." Yelland, at *26. "'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Montanez v. Thompson, 603 F.3d 243, 251 (3d Cir. 2010) (citing Saucier, 533 U.S. at 201). "[I]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Bayer v. Monroe

County Children and Youth Serv., 577 F.3d 186, 193 (3d Cir. 2009) (quoting Saucier, 533 U.S. at 202). "Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity." Yelland, at *27 (citing Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000).

Here, as in Yelland, where it is in dispute whether Defendants Ciach and Peterson violated Plaintiff's right to pre-deprivation procedural due process, and where we find that the Plaintiff's right under Loudermill to pre-deprivation process – including notice – "has been clearly established for many years," id. at *28, we find that Defendants are not entitled to qualified immunity.

*D. Liability of Upland Borough*

Lastly, with regard to Plaintiff's claim that Upland Borough as a municipality is also liable for violating his constitutional procedural due process rights, we grant Defendants' motion for summary judgment and deny Plaintiff's claim in Count IV. "A local government may not be sued under §1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

19

inflicts the injury that the government as an entity is responsible under §1983." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018 (1978). Plaintiff has failed to show any evidence that the Borough, through any policy or custom as a municipality, violated his constitutional right to due process.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is denied in part as to the claims against Defendants Ciach and Peterson in their individual capacities contained in Counts I and IV of the Complaint, and granted in part as to the claim against the Borough of Upland contained in Count IV of the Complaint. An appropriate Order will follow.